# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 2222 | **DATE** | 1/9/2003 |
| **CASE TITLE** | Susanne Hogan vs. The Paul Revere Life Insurance Co | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, Plaintiff's Partial Motion for Summary Judgement is denied and Defendant's Motion for Summary Judgement is denied. Counsel shall appear for a status hearing on 1/30/03 at 9:00 a.m. Enter Memorandum Opinion and Order.

(11) ■ For further detail see order attached to the original minute order.

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JAN 13 2003 | |
| | Notified counsel by telephone. | | date docketed | 60 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 1/10/2003 date mailed notice | |
| cav | courtroom deputy's initials | 03 JAN 10 PM 4:03 | cav mailing deputy initials | |
| | | 10 Date/time received in central Clerk's Office | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

JAN 1 3 2003

| | |
|---|---|
| SUSANNE HOGAN, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 99 C 2222 |
| | ) |
| THE PAUL REVERE LIFE INSURANCE | ) |
| COMPANY | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This case involves defendant insurer's denial of plaintiff's claims under an individual disability income policy and a business overhead expense policy. This matter is before the Court on cross-motions for summary judgment. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, Plaintiff's Partial Motion for Summary Judgment is denied and Defendant's Motion for Summary Judgment is denied.

## I. FACTS[1]

### A. Parties

Plaintiff Susanne Hogan ("Hogan") is an Illinois resident. Pl. Facts ¶ 1. Hogan is the president of a corporation which is in the business of construction management for real estate owners. Id. ¶ 2. Defendant The Paul Revere Life Insurance Company ("Paul Revere") is a corporation organized and licensed under the laws of the State of Massachusetts and is authorized to do business in the State of Illinois. Id. ¶ 3.

---

[1] The following facts are taken from the parties' Local Rule 56.1(a) and 56.1(b) Statements and accompanying exhibits and are undisputed unless indicated otherwise.



**B.**    <u>Hogan's Relevant Medical History</u>

On July 18, 1994, Hogan reported to Dr. Judith Frigo a history of back problems for which she had sought acupuncture treatment, weakness in her lower legs due to performing yard work, and numbness and tingling in her extremities which was severe enough to keep her awake at night. Def. Facts ¶¶ 58-61. On that same day, Dr. Frigo recommended an MRI to rule out multiple sclerosis as the cause of Hogan's medical symptoms, which was conducted on July 19, 1994. Id. ¶¶ 62, 63. On August 23, 1994, Hogan saw Dr. Frigo for a follow-up visit at which time she reported that her arms, legs, and back were still sore from over-exertion. At that time, Hogan was taking the prescription medications, Parafin Forte, a muscle relaxant for her back problems, and Elavil to help her sleep. Id. ¶¶ 64-67; Hogan dep., p. 56. Dr. Frigo referred Hogan to Dr. Glen Glista, a neurologist, who examined Hogan on August 26, 1994. Def. Facts ¶¶ 69-70. Dr. Glista continued Hogan on the prescription medication Elavil and prescribed Naprosyn. Id. ¶¶ 73, 76. Dr. Glista suggested the possibility of another MRI scan if Hogan's symptoms did not improve. Id. ¶ 72. On August 26, 1994, Dr. Glista sent a letter to Hogan and Dr. Frigo which described his impressions after examining Hogan. Def's Ex. N. Dr. Glista stated in part that Hogan may have "some chronic, cervical strain related to cervical spondylosis and tension." Id.

**C.**    <u>The Disability and Business Overhead Expense Policies</u>

On November 10, 1994, Hogan underwent a medical examination in connection with the application process for the Paul Revere disability policy and the BOE policy. Def Additional Facts ¶ 9. The medical application form in connection with Hogan's medical examination was completed by the medical examiner based upon responses given by Hogan. Id. ¶ 10. As part of the medical examination, Hogan was asked the following question:

11. Have you within the past five years:
a. Been examined by or consulted a physician or other practitioner?

The medical examiner recorded "Yes." Id. ¶ 19. The medical application provides as follows:

> Details of "Yes" answers. Identify question number. Circle applicable items. Include diagnosis, dates, duration and current status. List names and addresses of all attending physicians and medical facilities.

Id. ¶ 20. The medical examiner completed the "Yes" answer to paragraph 11 of the medical application as follows: "11 a – routine physical exam per Dr. Frigo." Id. ¶ 21. As part of the medical application, Hogan was also asked the following question:

> Have you, within the past five years: 11c. Had an x-ray, EKG, blood or urine test, or other lab tests?"

Id. ¶ 22. The medical examiner recorded "Yes" to question 11(c). Id. The medical examiner detailed Hogan's "Yes" answer to paragraph 11(c) of the medical application as follows: "11c– blood tests for other insurance applications in May, 1994." Id. ¶ 23. As part of the medical application, Hogan was asked the following additional question:

> 15. Have you ever had any known indication of or been treated for:
> (b) Any type of back or spinal trouble, including sprain or strain."

The medial examiner recorded "Yes" to question 15. Id. ¶ 24. The medical examiner detailed Hogan's "Yes" answer to paragraph 15(b) of the medical application as follows:

> 15b lumbar strain in Feb/March 1994; examined at LaGrange Hospital Emergency Dept., Dr. ?
> –no therapy required
> –no residual of impairment

Id. ¶ 25. Hogan was asked the following as part of the medical application:

> 16. Have you had any surgical operation, treatment, special diet or any illness, ailment, abnormality, or injury, not mentioned above, within the past five years?"

The medical examiner recorded "No" in response to paragraph 16. Id. ¶ 26. Hogan reviewed the responses recorded by the medical examiner on the medical application form and signed it on November 10, 1994. Id. ¶ 27.

On November 16, 1994, Hogan completed a written application for the DI policy and the BOE policy with Paul Revere. Def. Additional Facts ¶¶ 1, 2. John Miklos, an independent insurance producer, completed the applications for the DI and BOE policies with Hogan's assistance on November 16, 1994. Id. ¶ 3. Paul Revere contends that in completing Hogan's applications, Miklos read each of the questions contained in the applications to Hogan, Hogan responded to the questions, and Miklos filed in the answers that she gave him. Id. ¶ 6. Hogan denies that Miklos filled in the answers on the applications with all the information Hogan supplied him. Pl. Resp. to Def. Additional Facts ¶ 6.

The applications for both the disability policy and the BOE policy submitted to Paul Revere by Hogan, contain the following question:

> 6. Have you ever been diagnosed or treated for: (circle all conditions that apply and give details below) d. Disease or disorder, injury, strain or sprain involving the bones, joints, muscles, ligaments, knees, back or neck?

Miklos recorded "No." Def. Additional Facts ¶ 17. The applications for both policies also contain the following question:

> 7. In the past 5 years, have you had any medical advice or operation, physical exam, treatment, illness, abnormality, injury or seen a therapist, counselor, psychologist, psychiatrist, chiropractor, or health practitioner not list above?

Miklos recorded "Exam for Provident D.I." Id. ¶ 18.

Miklos certified on the agent's statement that there was no other information disclosed to him

by Hogan that was not recorded on the application or that was in conflict to the information contained on the application. Def. Additional Facts ¶ 7. Hogan reviewed the completed application for the disability and the BOE policies and signed the application in Miklos' presence. Id. ¶ 8. By signing the applications, Hogan certified the following:

It is understood and agreed as follows:

1)    I have read the statements and answers recorded above. They are to the best of my knowledge and belief, true and complete and correctly recorded. They will become part of this application and the basis for any policy issued on it.

Id. ¶14. By signing both policies, Hogan further certified the following:

It is understood and agreed as follows:

3)    No agent or broker has authority to waive the answer to any question, to determine insurability, to waive any of the company's rights or requirements, or to make or alter any contract or policy.

Id. ¶ 15. Miklos executed the applications on page 2 certifying as follows:

I certify that I have truly and accurately recorded on this application the information supplied by the Proposed Insured.

Id. ¶ 16.

On February 24, 1995, Paul Revere issued Hogan a DI policy and a BOE policy. Pl. Facts ¶¶ 4, 6. The polices were issued in response to and in reliance upon written applications including Hogan's statements contained therein and statements made by Hogan during the medical examination. Def. Facts ¶ 39. The DI and BOE policies issued by Paul Revere to Hogan replaced similar policies issued by Provident Life and Accident Insurance Company which Hogan purchased in July 1993. Pl. Facts ¶ 22. Hogan paid premiums for the policies for the period from February 24, 1995 through November 10, 1997. Def. Resp. to Pl. Facts ¶ 8.

The DI policy provides benefits commencing on the 91st day after Hogan is totally disabled as defined in the policy. Pl. Facts ¶ 9. The DI policy does not pay benefits for periods of partial disability. The BOE policy provides that benefits will begin to accrue following 60 days of total disability. Id. ¶ 11. The BOE policy does provide benefits for periods of partial disability. Id. ¶ 12. Under the BOE policy, however, no benefits for partial disability are payable unless there has been at least one day of total disability benefits paid. Id. ¶ 14.

The DI policy defines the terms "Disability" or "Disabled" as follows:

"Disability" or "Disabled" refers to a continuing period of Total Disability For a Maximum Benefit Period "To Age 65" or "Lifetime," successive periods will be deemed to be continuing if:

a.    Due to the same or related causes; and
b.    Separated by no more than 12 months.

For all other Maximum Benefit Periods, successive periods will be deemed to be continuing if:

a.    Due to the same or related causes; and
b.    Separated by no more than 6 months.

Otherwise such periods will be deemed to be new and separate Disabilities. The Maximum Benefit Period is shown on the Policy Schedule.

Pl.'s Ex. 4 § 1.11. The DI policy defines "Total Disability" as follows:

"Total Disability" means that because of Injury or Sickness:

a.    You are unable to perform the important duties of Your Occupation; and

b.    You are receiving Physician's Care. We will waive this requirement if We received written proof acceptable to Us that further Physician's Care would be of no benefit to You.

Id. § 1.10. The DI policy contains an "incontestable" provision which states in relevant part:

"After your Policy has been in force for 2 years, excluding any time You are Disabled, We cannot contest the statements in the application." Id. § 10.2.

The BOE policy defines the terms "Disability" or "Disabled" as follows:

"Disability" or "Disabled" refers to a continuing period of Total, and/or Partial Disability.

Successive periods will be deemed to be continuing if:

a.    Due to the same or related causes; and
b.    Separated by no more than 6 months.

Otherwise such periods will be deemed to be new and separate Disabilities.

Pl.'s Ex. 5 § 1.13. The BOE policy contains a definition of "Total Disability" which is identical to the definition of "Total Disability" in the DI policy. Pl. Facts ¶ 18. The BOE policy further provides that a partial disability must follow right after a period of total disability that continues at least to the commencement date of the BOE policy Id. ¶ 19. The commencement date under the BOE policy is the 61st day after a continuous period of total disability. Id. ¶ 20. The BOE policy also contains an "Incontestable" provision which provides, in relevant part, as follows: "After your policy has been in force for 2 years, excluding any time you are disabled, we cannot contest the statements in the application." Pl. Ex. 5 § 9.2.

### D.    Hogan's Accident

On January 17, 1997, Hogan was involved in an automobile accident in which Hogan suffered neck and shoulder injuries. Pl. Facts ¶¶ 23, 24. Hogan subsequently underwent three surgeries. Id. ¶ 24. After the accident, Hogan was completely off work for four to five days and then she returned to work. Id. ¶ 25. Hogan was unable to perform the important duties of her occupation between January 17, 1997 and January 22, 1997 due to the injuries she sustained in the January 17,

-7-

1997 automobile accident. Id. ¶ 26. Hogan was under the care of a physician from January 17, 1997 through January 22, 1997. Id. ¶ 27. In March-April 1997, Hogan was under the care of a physician for the injuries she suffered in the January 17, 1997 automobile accident. Id. ¶ 29. In late April 1997, Hogan could not longer perform the important duties of her occupation due to deteriorating health resulting from the injuries she suffered in the January 17, 1997 automobile accident. Id. ¶ 28. From late April 1997 through July-August 1998, Hogan was unable to perform the important duties of her occupation. Id. ¶ 30.

### E.    Hogan's Claims Under the Policies

On May 28, 1997, Hogan completed a Paul Revere claim form and mailed it to Paul Revere. Pl. Facts ¶ 31; Pl. Ex. 8. On the claim form, Hogan indicated that she had been totally disabled from January 17, 1997 to January 22, 1997. Pl. Facts ¶ 33. The claim form dated May 28, 1997 is the first notice received by Paul Revere that Hogan was making a claim for benefits under the policies. Id. ¶ 34. On June 26, 1997, Hogan completed a "Statement for Disability Benefits" form which was mailed to Paul Revere and received by its representative on or about June 30, 1997. Id. ¶ 35; Pl.'s Ex. 9. On the "Statement for Disability Benefits" form, Hogan stated that she was unable to work from January 18, 1997 to January 22, 1997. Pl. Facts ¶ 37. Hogan further stated on this form that she returned to work in a limited capacity but was unable to perform important duties of her occupation from January 22, 1997 to the present. Id. ¶ 38. On November 10, 1997, Paul Revere sent Hogan a letter denying her claims under the policies. Id. ¶ 41. The correspondence from Paul Revere stated that it was rescinding the policies issued by Paul Revere because Hogan did not reveal her complete medical history at the time of application and declaring the policies null and void from the date of issue. Id. ¶ 42; Def. Ex. P.

## II. DISCUSSION

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law" Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Id. at 256.

### A. Hogan's Motion for Partial Summary Judgment

Hogan moves for partial summary judgment on the issue of liability under Counts I and III of the amended complaint and on the defendant's counterclaim for recession. Hogan argues that Paul Revere's defense based upon alleged omissions or misrepresentations made by Hogan in the applications for DI and BOE insurance is barred by the two year incontestability provisions in the subject policies because Paul Revere failed to "contest" the policies within two years of issuance. Alternatively, Hogan maintains that under the terms of her policies she did not become disabled within the policy definition of "disabled" until after expiration of the two-year contest period.

"Incontestability" clauses "preclude the insurer from attempting to rescind the policy after the requisite contestability period has expired on the ground that the insured made misrepresentations in the application." Equitable Life Ins. Society of the U.S. v. Bell 27 F.3d 1274, 1279 (7th Cir. 1994). "The incontestability clause is thus in the nature of a statute of limitation and repose, obliging

the insurer to investigate the insured's medical history promptly else it become bound by representations contained on the insured's application." Id. at 1278 (citation and internal quotes omitted). Many states require incontestability clauses to appear in specified types of insurance policies. 17 Couch on Insurance 3D § 240:1, at 240-9 (2000). Illinois law governs this dispute and requires that each accident and health insurance policy delivered or issued for delivery to any person in Illinois shall contain one of two clauses limiting the time on defenses as to statements contained in the application:

> TIME ON CERTAIN DEFENSES:
>
> After 2 years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such 2 year period.
>
> * * *
>
> A policy which the insured has the right to continue in force subject to its terms by the timely payment of premium (1) until at least age 50 or, (2) in the case of a policy issued after age 44, for at least 5 years from its date of issue, may contain in lieu of the foregoing the following provisions (from which the clause in parentheses may be omitted at the company's option) under the caption "INCONTESTABLE":
>
> "After this policy has been in force for a period of 2 years during the lifetime of the insured (excluding any period during which the insured is disabled), it shall become incontestable as to the statements contained in the application."

215 ILCS 5/357.3 (2000). Paul Revere included the second version of the incontestability clauses provided in the statute in the DI and BOE policies at issue here.

Where a policy contains an incontestability clause, it is necessary for an insurer wishing to preserve its defenses to take affirmative action within the designated time period. Powell v. Mutual Life Ins. Co. of New York, 144 N.E. 825, 828 (Ill. 1924) (holding that "[T]o contest a policy for

fraud it is essential that the insurer proceed, by way of defense, to a suit brought upon the policy or by independent action to cancel the same, and that notice of recession, with tendering back premiums and interest, is not a contest within the meaning of the clause."); Ramsey v. Old Colony Life Ins. Co., 131 N.E. 108, 110 (Ill. 1921) (stating "[A] contest can be only by proceedings in court to which the insurer and the insured, or his representatives or beneficiaries, are parties."). Illinois follows the great majority of courts which hold that a legal contest has not been made within the meaning of the incontestable clause except by legal proceedings, and that the word "contest" means legal contest. Id.; 1A Appleman, Insurance Law and Practice, § 313, at 330 (1981). Moreover, Illinois law provides that terms used in an insurance policy are to be given their plain and ordinary meaning. Atchison v. St. Paul Surplus Lines Ins. Co., 767 N.E.2d 827, 829 (Ill.App. 2002). Under ordinary usage, the term "contest" means "[t]o assert a defense to an adverse claim in a court proceeding." Black's Law Dictionary 320 (6th ed. 1990).

Paul Revere argues that Ramsey and Powell decisions are inapplicable and distinguishable from this case because those cases involved the interpretation of incontestability clauses in life insurance policies and not disability policies as were issued to Hogan. According to Paul Revere, the difference between life policies and disability policies is that in a life insurance claim, it is the beneficiaries (not the person who made the application) seeking to obtain benefits, while in a claim for benefits under disability policies, the contest regarding alleged misrepresentations made in an application would be brought directly against the person who completed the application.

This distinction does not make a difference for purposes of determining what constitutes a contest. The purpose of incontestability clauses in life insurance and disability insurance policies is the same. Incontestability provisions "prevent[] an insurer from lulling the insured, by inaction,

-11-

into fancied security during the time when the facts could best be ascertained and provided, only to litigate them belatedly, possibly after the death of the insured." 17 Couch on Insurance 3D §240:5, at 240-13 (2000). As one authority explained:

> The length of time between the purchase of an insurance policy and the occurrence of a loss calling for the insurer to pay the insured or a designated beneficiary can be lengthy, indeed. In the case of life and disability insurance in particular, the policy may be in force for generations before a claim is filed. By the time that occurs, all details and most evidence concerning the condition of the insured at the time of the application are likely to be very stale if available at all.

Id. § 240:1, at 240-13. While this evidentiary dilemma is exacerbated in the case of life insurance where the insured is dead at the time a claim is filed for the proceeds, incontestability clauses in both life and disability policies limit the time within which and the grounds on which the validity of the policy may be questioned by the insurer. Any differences in the nature of life insurance and disability insurance contracts is irrelevant to the determination of meaning of the term "contest."

In addition, the cases relied on by Paul Revere are distinguishable from the present case. In Bronson v. Washington National Insurance Co., 207 N.E.2d 172 (Ill.App. 1965), plaintiff brought an action seeking a declaratory judgment that he was entitled to recover benefits under a disability insurance policy issued by defendant. The Appellate Court affirmed the trial court's dismissal of Bronson's suit. At issue in the case was the meaning of the incontestability clause in defendant's disability policy which provided:

> Time Limit on Certain Defenses: (a) After two years from the policy date no misstatements made by the Insured in the copy of the application for this policy shall be used to void the policy or deny a claim for loss incurred or disability (as defined in this policy) commencing after the expiration of such two-year period.

Defendant insurance company moved to dismiss plaintiff's complaint on the grounds that plaintiff had no right to recover benefits for a claim which commenced within two years of the policy date

where there were material misrepresentations in his application and the policy was terminated by defendant's refusal to accept premiums. Plaintiff responded that defendant could not raise the defense of misrepresentation and fraud because defendant failed to bring a court action to cancel or rescind the policy within two years of its date. The Illinois Appellate Court construed the incontestability clause of the disability contract as providing that the defendant insurance company could not raise a defense of misstatement in the application, after two years from the policy date, in defense of a claim by the insured, based on a loss incurred or disability which commenced after expiration of such two year period. Id. at 176. The court further held that conversely, the defendant may raise a defense of misstatement, after two years from the date of the policy, against claims commencing before the expiration of such two year period. Id.

Paul Revere similarly relies on Commercial Ins. Co. of Newark New Jersey v. Krain, 843 F.Supp. 404 (N.D. Ill. 1994), in which the district court rejected the insured's argument that the incontestability clause in his disability policy acted as automatic bar to any lawsuit filed more than two years after the effective date of the policy. The incontestability clause in the major medical policy at issue in Krain stated:

> After two years from the effective date of a person's insurance, no statements, unless fraudulent, made by such person may be used to void the insurance or deny a claim for loss incurred or disability which begins after the end of such two year period.

The parallel provision in the disability income protection plan provided:

> If you made a misstatement on the application for this policy, we may not use it to void this policy or to deny a claim for loss incurred or disability that starts after 2 years from the effective. But if the misstatement was fraudulent there is no time limit.

The court held:

> The language clearly applies to situations in which the *loss or disability* occurs more than two years after the effective date, and not necessarily in which any *lawsuit* is filed more than two years after the effective date. That is, these clauses do not bar an action filed more than two years after the start of the policy which deal with a loss incurred or a disability which begins less than two years after the start of the policy, as is the case here. Accordingly, the language does not unambiguously support Krain's argument; on the contrary, it unambiguously defeats it.

Id. at 406. In rejecting the insured's argument that the incontestability clauses precluded the insurance company from seeking restitution for benefits paid under the policies more than two years after their effective dates, the court stated:

> The necessary corollary of the above clauses is that Commercial *may* use any misstatements on the application to void the policy or deny a claim for loss incurred or disability that starts less than two years after the effective date.

Id.

Paul Revere claims that Hogan's situation is nearly identical to the insureds in the above cases and that Paul Revere may contest the validity of the policy, based on a misstatement, after two years from the date of the policy. Paul Revere fails to acknowledge that the incontestability clauses in this case differs in a material respect from the incontestability clauses at issue in the Bronson and Krain cases. The incontestability clauses in this case state only: "After your policy has been in force for 2 years, excluding any time you are disabled, we cannot contest the statements in the application." These incontestability clauses unambiguously bar Paul Revere, after the policy has been in force for 2 years, excluding any period during which Hogan is disabled, from contesting the policy based on any statement in Hogan's applications. In sharp contrast to the Bronson and Krain incontestability clauses, the incontestability clauses in Hogan's policies do not include a provision that would allow Paul Revere to deny a claim for loss incurred or disability commencing after the

expiration of the two year period. The Illinois statute permits the insurer to incorporate the substance of either version of the incontestability clauses provided in the statute. Paul Revere included the second version in the DI and BOE policies at issue here. <u>Bronson</u> and <u>Krain</u> interpreted the meaning of incontestability clauses based on the first version of incontestability clauses permitted by the Illinois statute.

Paul Revere raises one final argument in support of its position that <u>Powell</u> and <u>Ramsey</u> are distinguishable. Paul Revere points out that both decisions were issued in the 1920's, long before the 1937 enactment of Section 154 of the Illinois Insurance Code. Section 154 which applies to all insurance companies provides that a misrepresentation made by an insured in the negotiation for a policy of insurance will defeat or avoid the policy if made with "actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." 215 ILCS 5/154. Paul Revere notes that the plain language of Section 154 does not require a formal "contest" by way of a court proceeding for the insurer to assert its rights. Paul Revere also maintains that Section 154 eliminated any requirement of a formal contest by way of a legal proceeding within two years to void a policy based upon misrepresentation in an application.

The Court rejects Paul Revere's argument that Section 154 eliminated any requirement of a formal contest. Section 154 does not mention incontestability clauses or Illinois case law's requirement that an insurer take affirmative action within the designated period. If the legislature had intended to change existing law when it enacted Section 154 it could have done so. Because Section 154 was enacted after the Illinois Supreme Court's opinions in <u>Powell</u> and <u>Ramsey</u>, it must be presumed that the legislature acted with knowledge of the prevailing case law. <u>People v. Hickman</u>, 644 N.E.2d 1147, 1153 (Ill. 1994) (stating "[w]here statutes are enacted after judicial

opinions are published, it must be presumed that the legislature acted with knowledge of the prevailing case law."). If the legislature had intended to overrule these prior cases, it would have stated so. This Court interprets the legislature's failure to do so as an indication that the rule requiring some affirmative or defensive action taken in court to avoid an insurance policy has not been eliminated by the enactment of Section 154.

Paul Revere recognizes that Section 154 must be read in conjunction with both the incontestability clause contained in the policies, as well as Section 357.3 of the Illinois Insurance Code upon which the incontestability clauses are predicated. The provisions of Section 154 and the incontestability options provided by Section 357.3 are not inconsistent. When read together, these provisions allow an insurer to rely on misrepresentations made by the insured in the negotiation for a policy of insurance with actual intent to deceive or which materially affects either the acceptance of the risk or the hazard assumed by the company to defeat or avoid a policy, but the insurer must act within the time prescribed by the policy's incontestability provision which may or may not include an exception with no time limits for fraudulent misstatements.

Having determined that "contest" means a legal contest, the Court turns to the question of whether Paul Revere timely contested statements in Hogan's applications. On December 6, 1999, Paul Revere filed its counterclaim seeking to rescind both policies on the ground that Hogan failed to disclose material medical health information on her applications for insurance. Filing a counterclaim seeking recession constitutes a contest within the meaning of the incontestable clause. Both policies issued to Hogan contained two year incontestability clauses which included language tolling the incontestability period during periods of disability.

-16-

There are material disputes of fact concerning whether Paul Revere timely contested the policies. Hogan argues that Paul Revere is barred from contesting these policies because she did not become disabled until late April, 1997 after the expiration of the two year contestable period. Hogan admits, however, that "there appears to be contradictions between the Plaintiff's sworn testimony and [certain] exhibits relating to whether the Plaintiff was totally disabled during the period from January 22, 1997 through late April 1997." Hogan's reply, p. 5. Hogan concedes that she was unable to perform the important duties of her occupation from late April 1997 through August 1998.

The parties dispute whether Hogan remained disabled after August 1998. Hogan argues that after August 1998, she resumed her regular occupation and no claim is being made for disability benefits under either policy after that date. Paul Revere has presented evidence that Hogan's disability may have continued until sometime in early 2000. For example, Hogan testified that the job duties she could not perform because of the injuries she sustained in the accident were: (1) she could not drive to see her clients because she could not turn her head to back up her vehicle; (2) it was difficult and possibly unsafe to drive due to the pain and weakness in her wrists; and (3) she could not sit for a long period of time without pain. Hogan's dep., pp. 83, 85, 89. Hogan further testified that her neck problems cleared up to the point where she could turn her neck during the year 2000. Id., p. 85. Although she did some driving between 1997 and 2000, Hogan stated that she "significantly recovered during the Year 2000." Id. Hogan testified that in the year 2000 she returned to her pre-accident level and the number of hours she was working before the accident. Id. at 99. The above evidence creates a genuine dispute of material fact exists concerning whether Hogan remained disabled under the terms of the policy until the year 2000 and whether the two year

-17-

incontestability period was tolled during this entire period.  Hogan's summary judgment motion is

be denied.

**B.**     **Paul Revere's Motion for Summary Judgment**

Paul Revere's summary judgment motion seeks a judicial determination that Hogan's failure

to disclose certain medical information constitutes a misrepresentation that defeats and avoids the

policies of insurance issued to Hogan by Paul Revere.  Paul Revere argues that it has the right to

rescind Hogan's policies based on misrepresentations.  In Illinois, an insurance company may deny

coverage because of a misrepresentation in an application if the misrepresentation "shall have been

made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard

assumed by the company."  215 ILCS 5/154.  The Court must first determine whether there was a

misrepresentation and, if so, whether it was material to the policy of insurance.

**1.**     **Misrepresentation**

Hogan contends that she disclosed her complete medical history to John Miklos who was an

agent for Paul Revere and thus, Miklos' knowledge is attributable to Paul Revere.  Paul Revere

maintains that Miklos was Hogan's broker, and his knowledge may not be imputed to Paul Revere.

"Although the question [of] whether an insurance broker is the agent of the insured or the insurer is

generally one of fact, when the evidence clearly shows that the broker is the agent of the insured, it

becomes a matter of law."  <u>Lazzara v. Howard A. Esser, Inc.</u>, 802 F.2d 260, 264 (7th Cir. 1986).

Illinois court have defined an insurance broker as

> [O]ne who procures insurance and acts as middleman between the insured and the
> insurer, and solicits insurance business from the public under no employment from
> any special company, but, having secured an order, places the insurance with the
> company selected by the insured, or, in the absence of any selection by him, with the

company selected by such broker.

Id. "An insurance agent, on the other hand, has a fixed and permanent relationship to an insurance company that the agency represents and has certain duties and allegiances to the company." Id. An insurance agent generally acts as the agent of the insurer, while an insurance broker acts as an agent of the insured. Brandt v. Time Ins. Co., 704 N.E.2d 843, 848 (Ill. App. 1998). The knowledge of an insurance broker generally cannot be imputed to the insurance company. Royal Maccabees Life Ins. v. Malachinski, 161 F.Supp. 847, 851 (N.D. Ill. 2001). "However, an insurance broker can be an agent of an insurer for a limited purpose, such as soliciting insurance, while not thereby becoming a general agent of the insurer." Brandt, 704 N.E.2d at 848. Conduct during a transaction, not his title, determines whether a person is acting as a broker or as an agent for the insurer. Id. In applying Illinois law in diversity cases, federal courts in this jurisdiction have used the following four-part test to determine whether an intermediary in an insurance transaction was a broker for the insured or an agent for the insurance company: 1) who set the intermediary in motion first; 2) who could control the intermediary's actions; 3) who paid the intermediary[2]; and 4) whose interest was the intermediary to protect. Hardin, Rodriguez and Boivin Anesth. v. Paradigm Ins. Co., 962 F.2d 628, 634-35 (7th Cir. 1992).

Applying this four-part test to the undisputed facts of this case reveals that Miklos was an insurance broker whose knowledge, if any, as to Hogan's past medical history is not attributable to Paul Revere. Miklos had no exclusive relationship with Paul Revere and had no obligation to

---

[2] The issue of who pays the commission is given little weight because insurers are allowed to pay brokers under Illinois law. Malachinski, 161 F.Supp. at 852 n.2.

recommend any particular insurer. Miklos testified that he operated an independent insurance agency. Def's LR 56.1 Statement ¶ 11. Because he was an independent insurance producer, Miklos was capable of placing disability insurance with a number of disability insurance companies, not only with Paul Revere, in 1993 and 1994. Id. ¶¶ 12, 16. Miklos has never been an employee of Paul Revere. Def's LR 56.1 Statement ¶ 13.

For any broker to submit an application to Paul Revere for disability insurance for their clients, the broker had to enter into a standard brokerage contract with Paul Revere. DeLange dep., p. 10. Paul Revere did not have its own captive agents and the standard brokerage contract only allowed the broker to take and submit applications. Id; Def's LR 56.1 Statement ¶ 30. Paul Revere did not have its own sales force, but rather solicited independent insurance brokers such as Miklos to market Paul Revere's products to their clients. Miklos dep., p. 17. Miklos testified that he was unable to sell disability insurance for any insurance company without a valid license with that company. Id. Miklos had a written agency agreement with Paul Revere enabling him to submit applications to Paul Revere, but neither side provided the court with a copy of this agreement or the relevant provisions of the agreement.[3] Thus, there is no indication that Paul Revere had any control

---

[3] The fac that Miklos had an agreement with Paul Revere enabling him to submit applications is not sufficient in and of itself to show that he was Paul Revere's agent for purposes of submitting Hogan's application. In American Insurance Corp. v. Sederes, 807 F.2d 1402, 1405 (7th Cir. 1986), the insurance salesman, Zimmerman, had entered into an "agency agreement" with Fireman's Fund that referred to Zimmerman as "our agent" to offer and receive proposals for insurance and "our agent" to exercise authority within Illinois. The agreement did not include a promise by Zimmerman to sell only for Fireman's and its subsidiaries and did not indicate whether Zimmerman was permitted to sell for other companies. The court noted that although it may appear from the face of the agreement that Zimmerman was Fireman's agent for the purposes listed in the agreement,

over Miklos other than paying his commission compensation. Pinski v. Adelman, 1995 WL 669101,

* 13 (N.D. Ill. Nov. 7, 1995)

Miklos handled Hogan's disability insurance needs prior to her application for insurance with

Paul Revere. Hogan testified that she initially sent Miklos into the market in 1993 to procure

disability coverage for her. Miklos dep., p. 82. Miklos had obtained disability insurance policies

for Hogan from Provident, another insurance company, in July 1993. Although Hogan testified that

Miklos called her to discuss her insurance coverage with Provident, Miklos did so based on his

knowledge that she was unhappy with Provident's monthly billing system and wanted to find out if

she could save money on premiums. Hogan dep.,p. 21; Miklos dep., pp. 23-24.

Miklos recommended the Paul Revere policy to Hogan because he believed it best served

Hogan's interest in saving money. Hogan relied on Miklos' judgment regarding Paul Revere, but

---

Lazzara must be based on a proposition of Illinois law that the existence of a similar agency agreement does not control, but is just one of many facts bearing on the question whether the general principles of agency apply between an insurer and an "insurance agent." An intermediary may be called an "insurance agent" without being an "agent" of the insurer for the application of all principles of the law of agency.

The Seventh Circuit applied the four-part test and held that Zimmerman was not Fireman's agent because Zimmerman solicited business from the general public under no employment from any specific company, Zimmerman secured orders and placed them with the company selected either by the insured or by itself, Zimmerman did not have a fixed and permanent relationship to one insurance company, and Zimmerman had no exclusive allegiances to that insurer. Id. at 1406. Similarly, Miklos acted as a middleman between the insured and the insurer, he solicited insurance business from the general public under no employment from any special company, he placed insurance with the company selected by the insured or him, he did not have a fixed and permanent relationship to an insurance company, and he did not have exclusive allegiances to an insurer. These undisputed facts establish that Miklos was acting as Hogan's insurance broker at the time the Paul Revere applications were signed and completed.

-21-

Miklos was not obligated to obtain coverage from any particular insurer. Miklos testified that when he recommended to Hogan that she could save money by changing policies from Provident to Paul Revere, he believed he was representing Hogan's interest. Miklos dep., pp. 81-82. It is undisputed that Miklos never told Hogan that he was an agent of Paul Revere. Def's LR 56.1 Statement ¶ 31. Before applying to Paul Revere to replace the Provident policies, Miklos checked with Provident to see if Provident would change its policies to eliminate the height and weight rating for Hogan. Miklos dep, p. 21. If the Paul Revere policy would have been more expensive than the Provident policy, Miklos would not have recommended to Hogan that she switch her policies to Paul Revere because his goal was to save Hogan money. Id., p. 91. Although Miklos recommended Paul Revere, Hogan ultimately made the decision to purchase the Paul Revere policy. If Hogan had kept her Provident policies, Miklos would have continued to receive renewal commissions from Provident. Id., p. 67. After the Paul Revere policies were issued to Hogan, Miklos received a commission payment. The only reasonable inference from the above undisputed facts is that Miklos was Hogan's broker and not Paul Revere's agent.

In Pinski, the district court determined that the plaintiffs' allegations failed to establish that the insurance salesman, Adelman, was acting as the insured's broker and not as an agent of the insurance company. The court noted: "Adelman could have purchased the insurance policies from any insurance company that he or the Pinskis selected, thereby precluding us from finding that he owed any duty of loyalty to a single insurance company." Pinski, 1995 WL 669101 at * 13. Adelman offered to get the Pinskis "the best policy for the least cost" and purchased policies for the Pinskis from five different insurance companies. Similarly, Miklos was trying to save Hogan money

-22-

by replacing the Provident policies and he could have procured replacement insurance with a number of different insurers. Miklos testified that he would not have recommended Hogan switching her insurance from Provident if she could not save money.

Applying the four-part test, the Pinski court concluded that although Adelman approached Pinski, "Pinski could have walked away from the table. Instead Pinski allowed Adelman to get him th best policy for the least money. Thus, Pinski, not the insurance companies, put Adelman in motion." Id. at * 14. Similarly, although Miklos allegedly contacted Hogan regarding her disability insurance coverage, Hogan could have kept the Provident policies and not submitted applications to Paul Revere. Just as "Pinski could have told Adelman from whom to purchase the policies, thereby controlling Adelman's actions," Hogan could have instructed Miklos to leave the policies with Provident or from whom to purchase replacement policies. Hogan, not Paul Revere, controlled Miklos' actions.

In addition, Hogan has failed to present any evidence creating a genuine dispute of fact on the issue of whether Miklos or the medical examiner had apparent authority to act as Paul Revere's agent. "Apparent authority arises where a principal creates, through words or conduct, the reasonable impression that the putative agent has been granted authority to perform certain acts." State Security Ins. Co. v. Burgos, 583 N.E.2d 547, 551 (Ill. 1991). An insurance broker has apparent authority to act on behalf of the insurer "where the insurer knowingly *causes* or *permits* the broker to act so as to justify the insured in believing that the broker possesses the authority exercised." Id. "A broker's apparent authority to act as an agent of an insurer may be established by the course of dealings between the broker and the insurer." Id. If the insurer created the appearance of authority,

it is estopped to deny it to the detriment of a third party. Id.

Hogan contends that Paul Revere clothed Miklos and the medical examiner with authority to "complete the applications with whatever information they felt was necessary" because the applications were printed on Paul Revere forms, Miklos and the examiner presented the forms to Hogan as representatives of Paul Revere, and allegedly informed Hogan that the applications were completed in accordance with Paul Revere's requirements. Hogan's Response, p.7.

The above facts do not support a finding that Miklos or the medical examiner were Paul Revere's agents because the record is devoid of any words or conduct by Paul Revere which would create a reasonable impression that Miklos or the medical examiner were granted authority by Paul Revere to complete the applications with whatever information they felt was necessary. On the contrary, the undisputed evidence confirms that Paul Revere explicitly informed Hogan that its agents and brokers did not have authority to complete the applications with whatever information they felt was necessary. On both the Paul Revere disability policy application and the Paul Revere BOE policy application that were signed by Hogan, Hogan certified that she understood and agreed that "[n]o agent or broker has authority to waive the answer to any question, to determine insurability, to waive any of the Company's rights or requirements, or to make or alter any contract or policy." Moreover, on both applications, Miklos had to certify that he "truly and accurately recorded" the information supplied by Hogan rather than supplied whatever information he felt was necessary. By signing both applications, Hogan certified that she had read the statements and answers recorded by Miklos and that to the best of her knowledge and belief, they were true and complete and correctly recorded. Given these express statements in the Paul Revere applications,

-24-

a reasonably prudent person in Hogan's position could not conclude that Miklos or the medical examiner was authorized to complete the applications with whatever information they felt was necessary.[4]

Paul Revere also moves for summary judgment on the grounds that misrepresentations were made by Hogan in the insurance applications with actual intent to deceive and which materially affected the risk assumed by Paul Revere. A misrepresentation in an application for insurance is a "statement of something as a fact which is untrue and affects the risk undertaken by the insurer." Ratcliffe v. International Surplus Lines Ins. Co., 550 N.E.2d 1052, 1057 (Ill.App. 1990). An insurance company may deny coverage under a policy of insurance by reason of a misrepresentation in an application for insurance if the misrepresentation was made with actual intent to deceive the insurer or materially affects either the acceptance of the risk or the hazard assumed by the insurer under the policy. 215 ILCS 5/154. Because the conditions are disjunctive, either an intent to deceive or a material misrepresentation can avoid the policy. Liberty Mutual Ins. Co. v. Paul E. Larson Ins. Agency, 1999 WL 202971, *9 (March 31, 1999). "In other words, it is unnecessary for the insurer to prove that a misrepresentation was made with the intent to deceive if it was material to the risk assumed." Johnson-Maday v. Prudential Ins. Co. of American, 657 N.E.2d 1114, 1117 (Ill.App. 1995). In addition, "[i]ncomplete answers or a failure to disclose material information on an application for insurance may constitute a misrepresentation when the omission prevents the insurer from adequately assessing the risk involved." Methodist Medical Center of Illinois v. American

---

[4] Hogan did not present any evidence of a course of dealings between Miklos and Paul Revere.

<u>Medical Security Incorp.</u>, 38 F.3d 316, 320 (7th Cir. 1994).

Before a court may determine if a misrepresentation was made with actual intent to deceive or was material to the risk being asked to be accepted, the court must find that a misrepresentation was made. <u>Methodist Med. Ctr.</u>, 38 F.3d at 319. It is undisputed that Hogan failed to disclose in response to questions 11(a), 11(c), 15(b), or 16 in the medical application and questions 6 and 7 in the general applications that she had been treated by Dr. Frigo in July, 1994 for back pain, had undergone an MRI , and had been examined and treated by Dr. Glista in August, 1994. Hogan makes much of the fact that Miklos told her that answers to questions 6 and 7 were unnecessary because she had already undergone a medical exam, but this does not excuse her incomplete responses to questions 11(a), 11(c), 15(b), and 16 on the medical application. Pl. Additional Facts ¶ 22.

The medical application clearly and unambiguously asked whether Hogan had been examined by or consulted a physician or other practitioner in the past five years. It is undisputed that Hogan failed to report her examination and treatment by Dr. Glista in August 1994. The medical application further asked if within the past 5 years, Hogan had an x-ray, EKG, blood or urine test, or other lab test. Hogan did not report the MRI conducted on July 19, 1994. The medical application unambiguously asked whether Hogan ever had any known indication of or been treated for any type of back or spinal trouble, including sprain or strain. It is uncontroverted that Hogan failed to disclose that she had a history of back problems for which she had sought acupuncture treatment and for which Dr. Frigo treated with prescription medication in August, 1994. It is also undisputed that Hogan did not reveal Dr. Glista's August, 1994 statement that she may have "some

chronic, cervical strain related to cervical spondylosis and tension." Def's Ex. N.

Hogan contends that she disclosed the examinations and treatment by Dr. Frigo in July and August, 1994 to Miklos and the medical examiner who elected to record the information as an annual physical with Dr. Frigo and lumber-back strain treated at LaGrange Hospital in February/March 1994. Hogan also states that she disclosed to Miklos that she had been referred to a Dr. Glista by Dr. Frigo, and Miklos chose not to record the information. Hogan claims that she disclosed to Miklos that she had been referred for an MRI to rule out multiple sclerosis. Finally, Hogan admits that neither Miklos nor the medical examiner recorded that she had been prescribed medication by Dr. Frigo or Dr. Glista. Whether Hogan disclosed the facts regarding Dr. Frigo and Dr. Glista to Miklos and the medical examiner is irrelevant to the issue of whether Hogan made misrepresentations in her applications because Miklos and the medical examiner were not Paul Revere's agents and their knowledge may not be imputed to Paul Revere.

Hogan further argues that she did not make any misrepresentations or omissions on the medical applications even though she did not mention Dr. Glista in response to Question 11a, did not mention Dr. Frigo in response to Question 15b and failed to mention Drs. Frigo and Glista in response to Question 16 because she was never diagnosed as suffering from any definable disease or disorder and by early September 1994, she no longer had any physical complaints. Case law has rejected this argument that an insured is excused from completely disclosing examinations and treatments because the applicant believed the problem was minor and not material enough to mention. New England Mutual Life Ins. Co. v. Bank of Illinois in DuPage, 994 F.Supp. 970, 977 (N.D. Ill. 1998).

## 2.    Materiality

Finally, to prevail on summary judgment, Paul Revere must also show that the only reasonable inference from the record is that Hogan's misrepresentations were made with an intent to deceive or were material to the risk assumed. "A misrepresentation is material if 'reasonably careful and intelligent persons would regard the facts as stated to substantially increase the chances of the event insured against, so as to cause a rejection of the application'" or different conditions, such as higher premiums. Methodist Med. Ctr., 38 F.3d at 320; Malachinski, 161 F.Supp.2d at 853. Materiality may be established by the testimony of the insurer's underwriter or employees. Methodist Med. Ctr., 38 F.3d at 320. Materiality is generally a question of fact but summary judgment may be appropriate where the misrepresentation is of such a nature that no one would dispute materiality. Id.

Paul Revere contends that Hogan made fraudulent misrepresentations on the Paul Revere applications by failing to reveal physical complaints and the fact that she had been examined and treated by Dr. Frigo in July, 1994 and Dr. Glista in August, 1994 and failing to disclose the July 19, 1994 MRI or prescription medication. The elements of fraudulent misrepresentation are: (1) the false statement of material fact; (2) known or believed to be false by the party making it; (3) with the intent to induce the other party to act; (4) action by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. Gerill v. Jack L. Hargrove Builders, Inc., 538 N.E.2d 530, 536 (1989). Hogan has presented evidence indicating that she disclosed her complete medical history to both the medical examiner and Miklos and they decided what to include or not to include on the applications. This evidence is sufficient to raise a

genuine issue of material as to her intent. It is for the trier of fact to determine whether Hogan made misrepresentations of fact as to her medical history with the actual intent to deceive.

The Court also finds that a genuine dispute of material fact exists as to whether Hogan's misrepresentations were material. It was Paul Revere's practice to seek an underwriting opinion when a claim examiner discovered information that existed at the time the application was submitted which was omitted from the application. Peter dep., p. 13. Paul Revere's underwriter, Paul Peter, opined that if Paul Revere had known Hogan's complete medical history as it existed at the time of underwriting her policies, it would not have issued the disability and BOE policies to Hogan. Def's LR 56.1 Statement ¶ 90. Peter was employed as a director or an assistant vice president in the underwriting department for Paul Revere in 1997. Id. ¶ 85. Peter's opinion was based on his review of the underwriting file and claim file, including Hogan's applications for disability and BOE insurance, the medical examination forms, and medical records from Dr. Frigo and Dr. Glista. Def's LR 56.1 Statement ¶¶ 87, 88; Peter Aff. ¶ 12.

Questions of fact exist regarding whether Dr. Glista's record is accurate and, if not, how that fact would have impacted the question of whether the policies would have been issued. Dr. Glista's report states that Hogan reported that about three years ago she noticed difficulty with her arms with discomfort in her right shoulder. Def's Exh. N. Dr. Glista further stated that Hogan reported that she has had some intermittent achiness in her neck and shoulders over the last 3 years. Id. Hogan denies making these statements to Dr. Glista. She testified at her deposition that she told Dr. Glista that she first noticed difficulty with her arms and discomfort in her neck and shoulders over the last three months, not three years. Hogan dep., pp. 59-60. Peter considered Hogan's overall medical

history, including the record of Dr. Glista, in opining that if Paul Revere had known of Hogan's complete medical history it would not have issued the policies. Peter dep., p. 57. Peter testified that in rendering his opinion, he found it significant that Hogan's pain and symptoms dated back three years. Id. Summary judgment is inappropriate given this dispute regarding the accuracy of Dr. Glista's medical record which Peter relied on in reaching his opinion that the non-disclosures by Hogan were material.

### III. CONCLUSION

For the reasons explained above, Plaintiff's Partial Motion for Summary Judgment is denied and Defendant's Motion for Summary Judgment is denied. Counsel shall appear for a status hearing on January 30, 2003 at 9:00 a.m.

ENTER:

Nan R. Nolan
United States Magistrate Judge

Dated: Jan 9, 2003